## Case No. 4,758.

The FIDELITY.

[16 Blatchf. 569.][1]

Circuit Court, S. D. New York. Aug. 5, 1879.[2]

---

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]
[2] [Affirming Case No. 4,757.]

WAITE, Circuit Justice. It is well settled, that public property, devoted to public uses. and necessary for carrying on the operations of the government, is not subject to seizure and sale on execution. The supreme court of the United States had occasion to consider that question at its last term, in Klein v. New Orleans, 99 U. S. 149. It was there said, that "municipal corporations are the local agents of the government enacting them, and their powers are such as belong to sovereignty. Property and revenue necessary for the exercise of these powers, become a part of the machinery of government, and, to permit a creditor to seize and sell them to collect his debt, would be to permit him, in some degree, to destroy the government itself." "The test in such cases is as to the necessity of the property for the due exercise of the functions of the municipality." The same rule prevails in New York, and is laid down broadly and explicity in Darlington v. Mayor, etc., 31 N. Y. 164, 192, and Leonard v. City of Brooklyn, 71 N. Y. 498, 500. It would seem to be clear, that, if the instruments of government cannot be seized to pay a debt after judgment, they cannot before.

It is said, however, that the maritime law gave the libellant a lien on the tug for his damages, and that, whenever there is a maritime lien, an action in rem lies, in admiralty, for its enforcement. It seems to me that the same principle which forbids the seizure to pay a debt, forbids the lien, which can only be enforced by a seizure. Analogous questions have arisen in New York under the mechanics' lien laws, and in the very well considered case of Brinckerhoff v. Board of Education, 2 Daly, 443, the court of common pleas held that such a lien could not be acquired, on the express ground that public property devoted to public uses was exempt by public necessity from seizure and sale under execution. This case, it is said. was affirmed by the court of appeals, under the name of Poillon v. Mayor, etc., 47 N. Y. 666. In Leonard v. City of Brooklyn, 71 N. Y. 498, 501, where a similar question arose, it was said: "If judgments in other actions cannot be enforced by the sale of public property, for the reason that public exigencies require that such property should be exempt from seizure and sale, certainly, a judgment obtained under the lien law * * * should stand in no better position." For the reason, therefore. that the plaintiff's demand could not be "enforced as a mechanic's lien upon property held for public use by the corporate authorities of the city of Brooklyn," a demurrer to his complaint asking a foreclosure of such a lien, was sustained.

While the libellant concedes that the public vessels of the United States cannot be sued in rem, he insists that the exemption arises solely from the fact that the government itself cannot be sued, and then argues, that, because the municipality of New York may be sued in the common law courts, the

Edward D. McCarthy, for libellant.
William C. Whitney, for claimant.

instrumentalities of its government, coming within the admiralty jurisdiction, may be proceeded against according to the usages and practice of an admiralty court. As has already been seen, the public property of a municipal corporation cannot be seized on an execution, although the corporation may be sued to obtain a judgment on which an execution can issue. The simple right to sue, therefore, does not carry with it the right to seize all property. It follows, necessarily, that the exemption from seizure is not always the same thing as an exemption from suit.

A careful examination of the cases satisfies me that the exemption of public vessels from suits in admiralty arises not out of a want of power to sue the public owner, but out of a want of liability on the part of the vessel. A public vessel is part of the sovereignty to which she belongs, and her liability is merged in that of the sovereign. Under such circumstances, redress must be sought from the sovereign, and not from the instruments he uses in the exercise of his legitimate functions. Public creditors look to the public faith for their security, and not to the public property. But, it is insisted, that, during the public ownership, the maritime liability of the vessel may be incurred, although the remedy in admiralty is suspended. If this be so, then seamen employed on vessels of war, if their wages are not paid and their vessel is sold to private owners, to be employed in the ordinary business of commerce, may libel the vessel in the hands of her private owners, to secure their money. A simple statement of such a proposition is all that is required to show its fallacy. The real truth is, that, in such cases, the maritime law passes by the thing and places the liability on the sovereign owner alone, and not upon the maritime instrumentalities of his sovereignty. The cases of The Davis, 10 Wall. [77 U. S.] 15. and The Siren, 7 Wall. [74 U. S.] 152, are not at all in conflict with this. In the case of The Davis, the property was cotton shipped by the treasury agent of the United States, from Savannah, to the cotton agent in New York, and does not appear to have been in any manner devoted to the public use or connected with the operations of the government. In fact, it appears to have been property collected under the abandoned and captured property act, and shipped to New York for sale, so that the proceeds might go into the treasury, in accordance with the requirements of that act. The Siren was a case of prize, and the question was, whether damages caused by a collision, for which she was in fault, while on her way into port for adjudication, should be paid out of the proceeds of her sale on condemnation. No question of public use was involved. There was nothing to take it out of the general rules of maritime law, except its public ownership, and that, all will con-

cede, is not enough. Property does not necessarily become a part of the sovereignty because it is owned by the sovereign. To make it so, it must be devoted to the public use, and must be employed in carrying on the operations of the government. There may be some expressions of the learned justices who wrote the opinions in these cases, which, if separated from the facts then under consideration, would indicate that the lien extended to public vessels employed in the public service, as well as to others; but that question was not up for determination, and it is proper, therefore, to confine the actual decision to the cases as they stand.

In England, since the time of Edward I., it has been the practice to give the subject a suit against the crown, in the form of a "petition of right," which, being addressed to the sovereign in person, sets forth the grievance and asks redress. This the sovereign grants by directing "his judges to do justice to the party aggrieved." Thereupon, a judicial investigation of the matter is had, precisely the same as in suits between subject and subject. U. S. v. O'Keefe, 11 Wall. [78 U. S.] 178, 183. In admiralty, the lords commissioners of the admiralty represent the crown, and, in cases coming within the admiralty jurisdiction, they direct the admiralty proctor to appear and answer a suit to be commenced in the admiralty court. This is equivalent to a waiver by the crown of its privileges as sovereign, and to a consent that the rights of the parties be tried and determined in a suit as between subject and subject. In such cases, process never issues against the vessel, or, if it does, the vessel is not seized, but, when the necessary consent to the suit is given, the crown appears, and the trial is had. In the case of The Athol, 1 W. Rob. Adm. 374, the suit was not, in form even, in rem, but in personam. An application was made for a monition against the lords commissioners, "calling upon them to show cause why damage should not be pronounced for, and compensation awarded to owners of the ship and cargo, and to the master and crew, for the loss of their effects," in a case of collision with a troopship belonging to the crown and at the time engaged in public service. The process was at first refused, on the ground that it could not be enforced if the lords of the admiralty declined to appear, and also on the ground, that, if it should be found that damages had been occasioned by the fault of the Athol, payment could not be enforced. Subsequently, the lords of the admiralty came in voluntarily, and the case was heard and decided. The cases of The Swallow, 1 Swab. 30, and The Inflexible, Id. 32, were, in form, against the commanders of the vessels. By its appearance in this form of proceeding, the crown places itself on an equality with a subject, for the purposes of the controversy in hand, waiving all its privileges of sovereignty. The Lord Hobart, 2 Dod. 100, and

The Marquis of Huntly, 3 Hagg. Adm. 246, were, in form, suits in rem, but there was no seizure and no bail. This was only another way of bringing the crown into court. The form was unimportant. What was wanted was the voluntary appearance of the crown in court, and a waiver of its sovereign exemptions. For that purpose a suit, such as could be entertained by an admiralty court, was required, and, when the submission of the crown was obtained, the facts were adjudicated as between subject and subject. The suits were modes of proceeding resorted to with the consent of the crown, for the purpose of determining the question whether the crown should make good the loss. For that purpose the crown voluntarily laid aside its sovereignty and consented to be treated, in all that related to the inquiry, as a subject.

This, I think, is all that can be claimed from the English cases. The policy of that government is to submit itself to the jurisdiction of its own courts, on applications for a redress of grievances; and a suit in admiralty is a proper form of proceeding, in cases of maritime loss. For that reason the practice prevails of submitting all such grievances to the determination of that court. This is far from deciding that public ships can be subjected to maritime liens, without the express consent of the government to which they belong. That is the question which is now under consideration, and I do not understand that The Siren and The Davis, supra, go further than to decide that the property of the government, not devoted to the public use, is subject to such liens.

It seems to me, therefore, that, upon the main question, the case is with the claimant, and that the libel.must be dismissed. The stipulation filed to obtain the release of the tug is not a waiver of the question as to the original liability of the tug. The stipulation takes the place of the vessel, and, for all the purposes of the trial, the case goes on as if the vessel were itself in court.

A decree may be prepared dismissing the libel, with costs in both courts.